Filed 3/25/13  P. v. Andres CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D060774 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233575) |
| KEVIN LAMARR ANDRES, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill and William H. Kronberger, Jr., Judges.  Affirmed.


Kevin Lamarr Andres appeals the judgment sentencing him to prison for 10 years after a jury found him guilty of possession of cocaine base for sale and he admitted allegations concerning prior convictions.  Andres contends the trial court prejudicially erred by:  (1) denying his motion to suppress evidence obtained in violation of his constitutional right against unreasonable searches and seizures; (2) admitting at trial hearsay statements of anonymous informants that he was selling drugs on the night he

was arrested for the current offense; and (3) refusing to dismiss the allegations of a prior serious felony conviction. We reject these contentions and affirm the judgment.

I.

FACTUAL BACKGROUND

The primary contention on appeal concerns the legality of Andres's detention by police. We therefore summarize the testimony introduced at the hearing on Andres's suppression motion. Facts relevant to Andres's other appellate contentions will be discussed later.

A.      *Anonymous Reports of Narcotics Trafficking near 19th and J Streets*

The area around 19th and J Streets in San Diego has a reputation for narcotics trafficking. On the night of April 12, 2011, the San Diego Police Department received several telephone calls from anonymous sources reporting suspected narcotics activity in the area.

One call came in at 10:12 p.m. from a resident of the area. The call "was very generic and did not offer much information." The caller stated he suspected three Black men and a woman were "involved in some kind of narcotic transactions in his area and he was watching them." The caller did not provide any description of the suspects' clothing.

Another call came in at 10:17 p.m. from a different resident of the area. The caller stated he suspected two Black men were engaged in narcotics activity at 19th and J Streets. The caller did not provide any additional details in this call.

The same person who called police at 10:17 p.m. called back several times that night to provide additional information about suspected drug dealing. In one of those

2

calls, the caller reported a Black man wearing a blue jersey with the number 15 on it possibly was selling drugs out of a red and white Ford pickup truck at 19th and J Streets.

B.    *Andres's First Encounter with Police*

At approximately 11:00 p.m., Officers Chris Krumrei and Ali Bakhshizadeh were on patrol when they received a radio dispatch regarding a man wearing a No. 15 jersey who was possibly selling drugs out of a pickup truck.  The officers drove to the location, spotted the pickup truck, and ran a license plate check, which revealed Andres was the registered owner.  They also spotted a man wearing a No. 15 jersey as he was walking with two or three other men (one of whom was later identified as Andres's brother), and used a photograph of Andres they had obtained as part of the license plate check to identify him as the man wearing the jersey.

The officers then drove toward Andres as he walked near the curb.  When the officers reached Andres, Officer Bakhshizadeh, from inside the patrol car, asked him if he was Kevin Andres.  Andres answered "yes," and produced identification.  Andres's brother and the other men separated from Andres and kept on walking.  Officer Bakhshizadeh then asked for and obtained Andres's consent to search his person.  Officer Bakhshizadeh exited the patrol car, searched Andres, and found keys for a Ford vehicle in his pocket.

Officer Krumrei also exited the patrol car and asked Andres what he was doing in the area.  Andres responded he had taken a trolley and denied he had a vehicle there.  But when Officer Krumrei said he believed the keys found in Andres's pocket belonged to a pickup truck registered to Andres and parked around the corner, Andres admitted the

3

truck was his and said his brother had driven him there. The officers informed Andres he was loitering in a narcotics trafficking area and advised him to leave.

Andres began to walk away. The officers drove off in the opposite direction.

C.   *Andres's Second Encounter with Police*

Officer Luke Johnson, who also was on patrol and received the same dispatch received by Officers Krumrei and Bakhshizadeh, spotted Andres less than a minute after he separated from the other officers. Officer Johnson advised Andres to leave the area. Andres responded he was waiting for his brother and was getting ready to leave. Officer Johnson then departed.

D.   *Andres's Third Encounter with Police*

Almost immediately after he left Andres, Officer Johnson received a radio dispatch that a suspect matching Andres's description had gone back to the Ford pickup truck, reached in and out of a bag behind the seat of the cab, held what appeared to be a wad of cash, and was now standing in a driveway on private property. Officer Johnson drove to the pickup truck and arrived at the same time as Officer Nigro.

Officers Krumrei and Bakhshizadeh received the same radio dispatch as Officer Johnson and drove back to Andres's pickup truck. When they arrived, Officers Johnson and Nigro were already there talking to Andres as he sat on the curb.

Officer Johnson advised Andres that based on the multiple dispatches he and the other police officers had received regarding Andres's involvement in suspected narcotics trafficking, they were going to detain him to investigate further. Officer Johnson instructed Andres to sit on the sidewalk.

4

Next, Officer Johnson requested that a narcotics detection dog be brought to the scene to sniff Andres's truck. While they waited approximately 10 minutes for the dog to arrive, Officer Johnson telephoned the caller who had reported Andres's most recent activities to police. The caller stated he lived in the area for several years, saw narcotics dealings in front of his house, was familiar with how narcotics were sold in the area, and provided information to and worked with police in the conduct of narcotics operations. The caller also stated he was in close proximity with an unobstructed view of the police and Andres, and confirmed Andres was the man he had reported as dealing drugs.

While the officers were waiting for the narcotics detection dog to arrive, Andres received a telephone call from his brother. Officer Bakhshizadeh spotted Andres's brother up the street and called out to him. Andres's brother stated he was there to see Andres and became "nervous" when he saw him talking to police. Officer Bakhshizadeh ran a routine records check and learned Andres's brother was on probation and, as a condition of probation, had waived his Fourth Amendment rights. He searched Andres's brother and found several "wadded up" bills of different denominations in his pocket.

When the narcotics detection dog arrived, it sniffed the truck, sat down on the driver's side of the cab, and scratched the door, indicating there were narcotics inside. Seeing the dog's reaction, Andres lowered his head and uttered an obscenity. Officer Krumrei searched the cab and found a plastic bag containing 15.59 grams of cocaine base, an electronic scale with white residue on it, and other items. Andres and his brother were arrested and taken into custody. While Andres and his brother were being transported in the back of the patrol car, police recorded a conversation between them in

5

which Andres used obscene language to describe the anonymous callers and in which his brother asked him, "Why do you put it in the truck?"

II.

PROCEDURAL BACKGROUND

A.    *The Information*

The People charged Andres with possession of cocaine base for sale.  (Health & Saf. Code, § 11351.5.)  The People also alleged Andres had five prior drug offense convictions (*id.*, §§ 11350, subd. (a), 11360, subd. (a)); served two prior prison terms (Pen. Code, § 667.5, subd. (b)); and had one prior serious felony conviction (attempted robbery), which constituted a strike under the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, 1192.7, subd. (c)(19), (39)).[1]

B.    *Andres's Motion to Suppress Evidence*

Andres filed a motion to suppress the cocaine base, scale, and other evidence obtained as a result of his detention and arrest and the search of his truck.  He argued the evidence was inadmissible because he was unlawfully detained and searched without a warrant.  The People opposed the motion on the ground that under the totality of the circumstances the police had reasonable suspicion to detain Andres and to investigate the multiple anonymous reports they had received concerning his suspected involvement in drug dealing.  The People also argued the police had probable cause to arrest Andres and

---

[1]    The People also charged Andres's brother with possession of cocaine base for sale and alleged he had several prior convictions.  The two men were tried together, but Andres's brother is not a party to this appeal.

to search him and his truck after the narcotics detection dog indicated the presence of narcotics in the truck.

The trial court ruled that the officers' receipt of multiple anonymous reports of suspected drug dealing, knowledge the area had a reputation for drug dealing, and observation of Andres loitering in the area were sufficient to detain Andres; and it further ruled that once the narcotics detection dog indicated narcotics were in the truck, the officers had probable cause to arrest him and to search him and his truck. The court therefore denied Andres's suppression motion.

C. *The Verdict and Admissions*

A jury found Andres guilty of possession of cocaine base for sale. After the jury returned its verdict, Andres waived his trial rights on the allegations concerning his prior convictions and prison terms and admitted the allegations.

D. *The Sentence*

At the sentencing hearing, Andres asked the court to dismiss the allegations concerning his prior strike conviction and two prior prison terms. The court agreed to dismiss the allegations concerning one of the prior prison terms, but refused to dismiss the allegations concerning the other prior prison term or the prior strike conviction.

The court then imposed an aggregate prison term of 10 years. This consisted of three years for the conviction of possession of cocaine base for sale (Health & Saf. Code, § 11351.5), doubled under the Three Strikes law for the prior strike conviction (Pen. Code, §§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), plus consecutive terms of three years

7

for the prior drug offense conviction (Health & Saf. Code, §§ 11352, 11370.2, subd. (a)) and one year for the prior prison term (Pen. Code, § 667.5, subd. (b)).

## III.

## DISCUSSION

Andres argues the trial court committed prejudicial error in three respects: (1) denying his pretrial motion to suppress evidence obtained in violation of his constitutional right against unreasonable searches and seizures; (2) admitting at trial hearsay statements of anonymous informants regarding his drug dealing activities; and (3) refusing at the sentencing hearing to dismiss the allegations concerning his prior conviction of attempted robbery. We shall address each claim of error in turn.

A.   *Denial of Suppression Motion*

Andres's primary contention on appeal is that the cocaine base, scale, and other items seized from his truck, as well as statements he and his brother made while seized by police, were admitted at trial in violation of his Fourth Amendment right "to be secure in [his] person[], houses, papers, and effects, against unreasonable searches and seizures." (U.S. Const., 4th Amend.; see *Mapp v. Ohio* (1961) 367 U.S. 643, 655 [holding 4th Amend. applicable to states through 14th Amend.].) Andres argues his suppression motion should have been granted because he "was illegally stopped and detained and searched on the basis of uncorroborated anonymous tips provided through phone calls." Specifically, Andres challenges the legality of his detention on two occasions: (1) when Officers Krumrei and Bakhshizadeh spoke with him on the street and searched his person (the first police encounter), and (2) when Officer Johnson detained him at his truck and

8

summoned the narcotics detection dog (the third police encounter).  After setting forth the applicable standard of review, we shall explain why these contentions lack merit.

1.    *Standard of Review*

A defendant may move to suppress evidence obtained as a result of a search or seizure on the ground the search or seizure was unreasonable.  (Pen. Code, § 1538.5, subd. (a)(1)(A).)  On appeal from a trial court's ruling on a motion to suppress, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

2.    *Analysis*

The parties disagree over whether Andres's first encounter with police was a detention or a consensual encounter.  We need not resolve that dispute, however, because Andres has not shown any of the evidence he moved to suppress was obtained as a result of that encounter.  A defendant moving to exclude evidence as having been obtained in violation of the Fourth Amendment "has the initial burden to establish cause and effect, showing an exploitative nexus, between the challenged evidence and the primary illegality." (*People v. Cella* (1983) 139 Cal.App.3d 391, 400.)  Here, none of the physical evidence Andres moved to exclude (the cocaine base, scale, and other items found in his truck) was obtained as a result of the first police encounter; it was all obtained as a result of the third police encounter.  Nor did Andres satisfy his evidentiary burden with respect to the statements made by him or his brother that he argues should

9

have been suppressed. The only statements by Andres or his brother introduced at trial were made during the third police encounter, when the narcotics detection dog alerted to the truck and when Andres and his brother were being transported by police. Andres has not identified any specific statement he made during the first police encounter that was admitted against him at trial, and his brother was not present and therefore made no statements during that encounter. Without a causal connection between the evidence Andres moved to exclude and the first police encounter, that encounter, whether consensual or not, provided no basis for suppression.

We thus turn to the legality of the third police encounter, which the People concede was a detention and which resulted in discovery of incriminating evidence against Andres, including the cocaine base and scale Officer Krumrei found in Andres's truck. Relying principally on *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*) and cases following it, Andres argues his detention was illegal because (1) "the only information from the anonymous tip corroborated by police was the innocent and readily observable location and appearance of [Andres] standing near his truck," and (2) "police never observed [Andres] or his [brother] engaging in narcotics transactions or any other type of illegal activity." The People counter that the anonymous tips plus other information the police had was sufficient to give them reasonable suspicion to detain Andres. We agree with the People.

It is well established that a detention is permissible under the Fourth Amendment if the detaining officer can articulate specific facts that, when considered together, provide an objective basis for concluding the person detained has been, is, or is about to

10

be engaged in criminal activity. (E.g., *United States v. Cortez* (1981) 449 U.S. 411, 417-418 & fn. 2 (*Cortez*); *Terry v. Ohio* (1968) 392 U.S. 1, 21-22 (*Terry*); *People v. Souza* (1994) 9 Cal.4th 224, 230.) When evaluating the reasonableness of a detention, "the totality of the circumstances—the whole picture—must be taken into account." (*Cortez*, at p. 417.)

The defect in Andres's argument on appeal is that it does not consider "the whole picture." (*Cortez*, *supra*, 449 U.S. at p. 417.) Focusing exclusively on the fact that police verified only that one of the anonymous callers had correctly described Andres's race, clothing, vehicle, and location, Andres insists that was not sufficient corroboration to make the tip reliable. It is true that a single anonymous informant's "accurate description of a subject's readily observable location and appearance" is not enough to create a reasonable suspicion that the subject is engaged in criminal activity, because such a description "does not show that the tipster has knowledge of concealed criminal activity." (*J.L.*, *supra*, 529 U.S. at p. 272.) "The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." (*Ibid.*) Thus, *if* "the whole picture" (*Cortez*, at p. 417) had included *only* police confirmation of the anonymous report that Andres and his truck were in the vicinity of 19th and J Streets, under *J.L.* the police would not have had sufficient grounds to detain Andres. (*J.L.*, at pp. 270-272; *People v. Saldana* (2002) 101 Cal.App.4th 170, 175.) But, as we shall explain, that was *not* "the whole picture." (*Cortez*, at p. 417.)

The police had several other pieces of information that, together with the anonymous tips, justified Andres's detention. The receipt of "two independent tips from

11

citizens, very close in time, describing in a similar manner the criminal activity . . . and suspect's physical attributes and location," supported the reliability of the tips. (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 59.) The fact that one of the informants telephoned repeatedly to report suspected criminal activity as it was happening indicated the caller had firsthand knowledge, which further enhanced the tips' reliability. (See *People v. Dolly* (2007) 40 Cal.4th 458, 468 [tipster's contemporaneous viewing of suspicious activity enhances reliability of tip].)[2] Additionally, the officers' knowledge that the area around 19th and J Streets has a reputation for narcotics trafficking is "among the relevant contextual considerations in a *Terry* analysis." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124.) Thus, police observation of Andres walking in that area late at night with no apparent purpose, and his refusal to leave after he agreed to do so, supported a reasonable suspicion criminal activity might have been afoot. (See *People v. Huggins* (2006) 38 Cal.4th 175, 242 [defendant's "loitering in a high-crime residential area at night" was factor supporting investigative detention].) Andres's false statement to Officer Krumrei that he had taken the trolley and did not have a vehicle in the area, which suggested he did not want police to know his truck was nearby, also supported a reasonable suspicion

---

[2]    The People also contend the tips were reliable because Officer Johnson "had the ability to talk to one of the callers directly, ask questions, and gauge the caller's credibility." Officer Johnson did not talk to that caller until *after* Andres had been detained, however. Thus, whatever information Officer Johnson obtained during that conversation could not have supported his decision to detain Andres because the information was not "available to the officer *at the moment of the seizure*." (*Terry*, *supra*, 392 U.S. at p. 22, italics added; see also *J.L.*, *supra*, 529 U.S. at p. 271 ["The reasonableness of official suspicion must be measured by what the officers knew *before they conducted their search*." (italics added)].)

12

Andres might be using the truck in drug trafficking. (See *People v. Carrillo* (1995) 37 Cal.App.4th 1662, 1671 ["false statements designed to mislead or ward off suspicion a particular vehicle may contain contraband" support probable cause to search vehicle].)

In short, based on "the whole picture" (*Cortez*, *supra*, 449 U.S. at p. 417), including the anonymous tips and the independent police observation of suspicious activity that corroborated those tips, the police had sufficient grounds to detain Andres. (See *Alabama v. White* (1990) 496 U.S. 325, 331 [investigative detention justified when "anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity"]; *People v. Jordan* (2004) 121 Cal.App.4th 544, 558 ["Where police officers follow up an anonymous tip and observe suspicious behavior, the totality of the circumstances may generate a reasonable suspicion that justifies a *Terry* stop and frisk."].) We thus reject Andres's argument that his detention during the third police encounter was unconstitutional under *J.L.*, *supra*, 529 U.S. 266.

We also reject Andres's related argument that his detention was unlawful because none of the police officers ever saw him dealing drugs or committing any other criminal act. We have upheld a detention based on a corroborated anonymous tip of drug dealing, even though the detaining officer "did not testify that he observed actual drug dealing." (*People v. Ramirez* (1996) 41 Cal.App.4th 1608, 1619.) Similarly here, the anonymous tips were corroborated, but the detaining officers admitted they never observed Andres engage in any drug dealing or other criminal activity. Of course, had the officers observed such conduct, they would have had probable cause to arrest Andres immediately. (Pen. Code, § 836, subd. (a)(1); *Atwater v. City of Lago Vista* (2001) 532

13

U.S. 318, 354.) The level of suspicion needed to detain a suspect, however, is "obviously less demanding than that for probable cause" and can be established by "considerably less than proof of wrongdoing by a preponderance of the evidence." (*United States v. Sokolow* (1989) 490 U.S. 1, 7.) The "'whole picture'" discussed above satisfied the Fourth Amendment's requirement of "'some minimal level of objective justification' for making the stop." (*Id.* at pp. 7, 8.)

Having legally detained Andres for suspicion of narcotics trafficking based on the totality of the circumstances, the police officers were entitled to conduct an investigation to determine whether a crime had been committed. "[I]f the circumstances are 'consistent with criminal activity,' they permit—even demand—an investigation: the public rightfully expects a police officer to inquire into such circumstances 'in the proper discharge of the officer's duties.'" (*In re Tony C.* (1978) 21 Cal.3d 888, 894.) In particular, the officers were entitled to have the narcotics detection dog sniff Andres's truck, and, once the dog indicated the presence of narcotics, they had probable cause to search the truck. (*Florida v. Harris* (2013) ___ U.S. ___, ___ [185 L.Ed.2d 61, 133 S.Ct. 1050]; *People v. Stillwell* (2011) 197 Cal.App.4th 996, 1006; *People v. Salih* (1985) 173 Cal.App.3d 1009, 1015.)[3] The cocaine base, scale, statements of Andres and his brother, and other evidence Andres sought to suppress were thus legally obtained.

---

3    Andres does not challenge the reliability of the reaction of the narcotics detection dog to his truck. The police officer who took the dog to Andres's truck testified about the dog's training and certification concerning narcotics detection.

14

In sum, police did not violate Andres's Fourth Amendment rights when they seized him and searched his truck. The trial court therefore correctly denied his motion to suppress the evidence obtained as a result of the seizure and search.[4]

B.      *Admission of Anonymous Informants' Hearsay Statements at Trial*

Andres next argues the trial court erred by admitting at trial testimony from police officers relating some of the content of the anonymous tips they had received regarding Andres's suspicious conduct. According to Andres, that testimony was irrelevant, was more prejudicial than probative, and constituted inadmissible hearsay; and further, its admission violated his constitutional right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; see *Pointer v. Texas* (1965) 380 U.S. 400, 403 [holding 6th Amend. confrontation right applicable to states through 14th Amend.].) We shall provide additional background and then analyze, and ultimately reject, these contentions.

1.      *Additional Background*

The People moved in limine to allow admission of testimony from police officers about the telephone calls received from anonymous informants reporting Andres's suspected drug dealing. The People argued the testimony was admissible for the nonhearsay purpose of explaining to the jury why the officers suspected Andres was

---

4       We summarily reject Andres's related argument that his trial counsel provided constitutionally ineffective assistance by not urging the same grounds that underlay the suppression motion as a basis for a motion to dismiss the information under Penal Code section 995. Andres's brother did reassert the suppression motion arguments in a motion to dismiss, and the trial court denied the motion. For Andres also to repackage the suppression motion as a motion to dismiss would have served no useful purpose. The constitutional right to the effective assistance of counsel "does not require counsel to raise futile motions." (*People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24.)

15

involved in drug dealing and why they conducted the investigation they did. The People also argued the testimony would prevent the jury from speculating on those matters.

Andres's trial counsel objected that the proposed testimony regarding the anonymous tips was irrelevant and its prejudicial effect outweighed its probative value. Counsel also argued admission of the proposed testimony would violate Andres's federal due process rights.

The trial court overruled Andres's objections and allowed the People to offer testimony from police officers regarding the anonymous tips. The court conditioned its ruling "upon it being [of] a generalized nature as represented."

At trial, Officers Krumrei, Bakhshizadeh, and Johnson testified that on the night of April 12, 2011, they received multiple radio dispatches relaying telephone calls from area residents reporting suspected narcotics activity. The officers testified one of the callers described a red and white pickup truck and a Black man wearing a No. 15 jersey.

At the beginning of this testimony, the trial court instructed the jury as follows:

"In this case, you are going to hear testimony of what this officer heard over the radio about what somebody else called in and reported to the police dispatcher, so it's double removed back, so that the information that you're going to receive is not received by you or to be considered by you for the truth of those statements made by the person to the 911 operator.

"Rather, the information is admitted in this instance to explain the conduct of the police officers and the consequences of their statements to the defendant, but it is not for the truth of what the person who called in about."

"You will be receiving testimony here as to what the officer heard over the radio. Don't take that as true. That what happened, what he was told was true or false, that's not the issue. It is what he did, why he did it."

16

Immediately prior to closing arguments, the court gave the jury a similar instruction patterned after CALCRIM No. 303:

> "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.
>
> "You have heard certain statements regarding 911 calls made to the police. You may not consider those specific statements to the police as proof that the facts within those statements are true. You may only consider those calls to the extent they assist you in understanding why the officers did what they did in this case."

2.    *Analysis*

We agree with Andres the trial court should have excluded the police officers' testimony about the anonymous tips they had received because the testimony was irrelevant. Only relevant evidence is admissible (Evid. Code, § 350), and to be relevant evidence must have some tendency to prove or disprove a disputed fact of consequence to the determination of the case (*id.*, § 210). Testimony from a police officer relating information he received from a third party to explain why the officer acted as he did is not relevant when the good faith or reasonableness of his conduct is not at issue. (*People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110 (*Lucero*); *People v. Reyes* (1976) 62 Cal.App.3d 53, 68.) Here, the question presented to the jury was whether Andres possessed cocaine base for sale, i.e., whether he had control over a usable amount of cocaine base, knew it was present and was a controlled substance, and intended to sell it. (See Health & Saf. Code, § 11351.5; *People v. Montero* (2007) 155 Cal.App.4th 1170, 1175-1177 [discussing elements of offense].) The information that prompted the officers to conduct their investigation had no tendency to prove or disprove that Andres

17

committed that offense. Thus, the officers' testimony about the anonymous tips "was simply irrelevant for the nonhearsay purpose offered because it had no tendency in reason to prove any disputed issue of fact in the action." (*Lucero*, at p. 1110.)[5]

The People counter that the testimony about the tips was needed to explain why the police investigated Andres and to prevent the jury from speculating about the reasons for the investigation. The People quote a treatise for the proposition that police "officers should not be put in the misleading position of appearing to have happened upon the scene and therefore should be entitled to provide some explanation for their presence and conduct." (2 McCormick, Evidence (6th ed. 2006) The Hearsay Rule, § 249, p. 136.) But they omit the sentences surrounding the one they quote, which refute their argument:

> "*One area where abuse may be a particular problem involves statements by arresting or investigating officers regarding the reason for their presence at the scene of a crime.* The officers should not be put in the misleading position of appearing to have happened upon the scene and therefore should be entitled to provide some explanation for their presence and conduct. *They should not, however, be allowed to relate historical aspects of the case, such as complaints and reports of others containing inadmissible hearsay. Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted. The need for this evidence is slight, and the likelihood of misuse great. Instead, a statement that an officer acted 'upon information received,' or words to that effect, should be sufficient.*" (*Id.* at pp. 136-137, italics added, fns. omitted.)

---

[5]     Our conclusion the officers' testimony about the anonymous tips was irrelevant makes it unnecessary for us to consider Andres's appellate argument that the testimony should have been excluded under Evidence Code section 352 because the testimony was more prejudicial than probative. Section 352 gives a trial court "discretion to exclude *relevant* evidence '"if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice."'" (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119, italics added.) That discretion does not come into play where, as here, the challenged evidence is *irrelevant*.

The cases the People cite are also unhelpful because they considered only hearsay objections to out-of-court statements offered for nonhearsay purposes, not relevancy objections. (See *People v. Beamon* (1973) 8 Cal.3d 625, 633-634; *People v. Smith* (1970) 13 Cal.App.3d 897, 910; *People v. Spivak* (1959) 166 Cal.App.2d 796, 812-813.) "[I]t is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.) We thus reject the People's argument that the police officers' testimony about the anonymous tips was properly admitted.

Nevertheless, the error in admitting the officers' testimony was harmless. The testimony was brief and general, and the trial court advised the jury, both before and after the testimony was given, that it could not consider the testimony for the truth of the information contained in the tips but only for the limited purpose of explaining the officers' conduct in responding to the tips. We presume the jury followed these instructions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26; *People v. Panah* (2005) 35 Cal.4th 395, 492.) Further, other evidence pointed convincingly to Andres's guilt. Officer Krumrei testified he found 15.59 grams of cocaine base and a scale in Andres's truck. Officer Johnson testified such a large quantity of cocaine base indicated it was intended for sale and could sell for up to $3,000 on the street. Also, the prosecutor only referenced the tips very briefly at one point near the beginning of his closing argument. On this record, we cannot say "it is reasonably probable that a result more favorable to [Andres] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) We thus discern no "miscarriage of justice" that would allow us to reverse the judgment based on the trial court's error in admitting the challenged

19

testimony.  (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); see *Lucero*, *supra*, 64 Cal.App.4th at p. 1110 [concluding error was harmless under similar circumstances].)

Nor do we discern in the admission of the police officers' testimony about the tips a violation of Andres's right "to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  The right to confront adverse witnesses bars the use of "testimonial" hearsay statements against a criminal defendant unless the declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant.  (*Crawford v. Washington* (2004) 541 U.S. 36, 53-54.)  A statement is testimonial when it constitutes "'[a] solemn declaration or affirmation'" or "a formal statement [by an accuser] to government officers" (*id.* at p. 51), and when its "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution" (*Davis v. Washington* (2006) 547 U.S. 813, 822).  Statements made in 911 calls (such as those at issue here) repeatedly have been held to be nontestimonial because they were neither formalized nor given primarily to document facts for possible use in a later criminal trial.  (See, e.g., *id.* at p. 827; *People v. Gann* (2011) 193 Cal.App.4th 994, 1008; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1464.)  Even if we assume the anonymous informants' statements were testimonial, the result would be the same because the Sixth Amendment "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  (*Crawford*, at p. 59, fn. 9.)  Since the police officers' testimony about the tips was admitted solely for a nonhearsay purpose (i.e., to explain why the officers focused their investigation on Andres and his truck) and the trial court repeatedly

instructed the jury it could not consider the testimony for any other purpose, its admission did not violate Andres's confrontation rights.

C.      *Refusal to Dismiss Allegations of Prior Serious Felony Conviction*

Andres contends the trial court abused its discretion by denying his invitation to dismiss the allegations concerning his prior conviction of attempted robbery.  He argues "the interests of justice weighed heavily in favor of dismissal" based on the remoteness of the prior conviction, the nonviolent and victimless nature of the current offense, and his positive character and prospects.  After setting forth additional background, we shall explain why these contentions are unpersuasive.

1.      *Additional Background*

Prior to the sentencing hearing, the trial court received and read a probation report that detailed Andres's criminal history.  It listed offenses dating back to 1993, including robbery, receipt of stolen property, petty theft, burglary, trespass, attempted robbery, resisting a police officer, and multiple drug offenses.  The report stated Andres had at least five parole violations, but successfully completed parole after having been released from a program for drug addicts.  According to the probation report, prior to his arrest Andres was doing well in college, had his own consulting business, and worked two jobs.  The report also stated Andres had a long history of substance abuse and was abusing methamphetamine daily at the time of the current offense.

The People submitted a sentencing memorandum that discussed aggravating factors.  The People pointed out the crime involved a large quantity of contraband, and

21

Andres had numerous prior convictions, served a prior prison term, and performed unsatisfactorily on parole.

At the sentencing hearing, Andres's trial counsel asked the court to dismiss the allegations concerning the prior attempted robbery conviction. Counsel conceded Andres had a significant prior criminal history, but argued the prior conviction should be stricken because it was 14 years old, Andres had successfully completed parole, and he was working and going to college at the time.

Andres then addressed the court. He stated he attended school, ran his own business, worked two part-time jobs, volunteered at Toys for Tots every Christmas, volunteered to clean up the beach every summer, completed two drug programs, and attended Narcotics Anonymous classes. Andres contended: "It's just I'm not that person that you are depicting on this and I'm being depicted on this paperwork, you know, as hardened or whatever [the prosecutor] wanted to call me. That's not me."

After listening to Andres and considering the arguments of counsel, the court expressly acknowledged its discretion to dismiss the allegations concerning the prior conviction. In exercising its discretion, the court stated it had to consider Andres's future prospects, his criminal history, and whether he fell within the scope of the Three Strikes law. The court credited Andres for successfully completing a program for drug addicts, but noted he had not remained crime-free since his release from prison for the attempted robbery conviction, and in fact had committed multiple offenses and served another prison term. The court then concluded: "I think on the whole in looking at [Andres's] prospects I cannot truthfully say that he's outside of the scope of [the Three Strikes law]

22

and the purpose thereof.  He's a continuing offender, albeit perhaps low level.  Nonetheless, he's still within the strike provisions.  And thus, I will decline to strike the allegations of the strike."

    2.    *Analysis*

A trial court may dismiss prior felony conviction allegations in cases prosecuted under the Three Strikes law when dismissal is "in furtherance of justice."  (Pen. Code, § 1385, subd. (a); see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.)  "[T]he law creates a strong presumption that any sentence that conforms to [its] sentencing norms is both rational and proper."  (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).)  In deciding whether to dismiss prior conviction allegations, the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*People v. Williams* (1998) 17 Cal.4th 148, 161.)  We review a trial court's refusal to dismiss prior conviction allegations for abuse of discretion.  (*Carmony*, at p. 375.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*Id.* at p. 377.)

There was no abuse of discretion here.  The trial court's statements at the sentencing hearing indicate its awareness of its discretion to dismiss the allegations of the prior attempted robbery conviction and the factors it was to consider in exercising that

discretion. Various mitigating and aggravating factors were presented in the probation report (which the trial court read and signed), the People's sentencing memorandum, and counsel's arguments and Andres's statements at the sentencing hearing. These sources presented no "'extraordinary [circumstances] by which [Andres] can be deemed to fall outside the spirit of the very scheme within which he squarely [fell] once he committ[ed] a strike as part of a long and continuous criminal record.'" (*Carmony*, *supra*, 33 Cal.4th at p. 378.) Moreover, the trial court considered the mitigating and aggravating factors and, on balance, concluded Andres was "a continuing offender, albeit perhaps low level," but "still within the strike provisions." Where, as here, the record indicates the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the Three Strikes law, we must affirm its ruling. (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

_____

IRION, J.

WE CONCUR:

_____
McCONNELL, P. J.

_____
NARES, J.